**MOVE, INC., et al.**

v.

**REAL ESTATE ALLIANCE LTD., et al.**

Case No. CV 07cv–02185–GHK (AJWx)

United States District Court, C.D. California.

Signed December 1, 2016

Attorneys Present for Plaintiffs: None

Attorneys Present for Defendants: None

**Proceedings: (In Chambers) Order re:** Plaintiffs' 7/15/2016 Motion for Summary Judgment (Doc. 572), Plaintiffs' 10/18/2011 Motion for Summary Judgment (Doc. 475), and Defendants' 10/18/2011 Motion for Summary Judgment (Doc. 474)

The Honorable GEORGE H. KING, U.S. DISTRICT JUDGE

In about four months, this case will be ten years old. Because life is short and this case has already taken up too much of it, we are doing our best to move this case forward. On May 16, 2016, we agreed to resolve all outstanding summary judgment issues, even though these issues will be rendered moot if our April 25, 2016 order on divided direct infringement is affirmed on appeal. Resolving these issues now is the most expeditious manner of proceeding because it will allow for a single appeal to the Federal Circuit. We have considered the parties' joint brief on Plaintiffs' July 15, 2016 Motion for Summary Judgment (Doc. 572), the joint brief on the December 12, 2011 Summary Judgment Motions (Doc. 476), and the portions of the record cited by the parties. We deem this matter appropriate for resolution without oral argument. L.R. 7–15. Accordingly, we rule as follows:

## I. Background

On July 16, 1991, Defendant Real Estate Alliance Ltd. ("REAL") was awarded U.S. Patent No. 5,032,989 (the " '989 Patent") for an invention by Mark A. Tornetta ("Inventor Tornetta" or "Tornetta"). The '989 Patent is a continuation-in-part patent of U.S. Patent No. 4,870,576 (the " '576 Patent"), also invented by Tornetta and also assigned to REAL. The '576 Patent has an effective filing date of March 19, 1986; the '989 Patent has an effective filing date of April 24, 1989. Both patents have expired.

According to its Abstract, the '989 Patent describes "a method for locating available real estate properties for sale, lease or rental using a database of available properties at a central location and remote stations which use a graphic interface to select desired regions on a map of the areas of interest." Doc. 575–1 at 2. The '989 Patent contains a single independent claim, and eleven dependent claims. *Id.* at 23. The sole independent claim, Claim 1, recites:

A method using a computer for locating available real estate properties comprising the steps of:

creating a database of the available real estate properties;

displaying a map of a desired geographic area;

selecting a first area having boundaries within the geographic area;

zooming in on the first area of the displayed map to about the boundaries of the first area to display a higher level of detail than the displayed map;

displaying the zoomed first area;

selecting a second area having boundaries within the zoomed first area;

displaying the second area and a plurality of points within the second area, each point representing the appropriate geographic location of an available real estate property; and

identifying available real estate properties within the database which are located within the second area.

*Id.* at 23.

On April 3, 2007, Plaintiffs Move, Inc., National Association of Realtors, and National Association of Home Builders (col-

lectively, "Move") filed this action seeking a declaratory judgment that the '576 Patent and the '989 Patent are invalid, unenforceable, and not infringed. Doc. 1. On January 12, 2009, Move filed its second amended complaint. Doc. 198. REAL filed an answer and asserted a counterclaim for patent infringement. Doc. 210. Move responded and asserted several affirmative defenses. Doc. 221.

On November 25, 2009, we entered our claim construction order. Doc. 419. After stipulating to a finding of non-infringement based on our construction (Doc. 426), REAL appealed to the Federal Circuit, which reversed on some points. Doc. 450 (published at *Move, Inc. v. Real Estate All. Ltd.*, 413 Fed.Appx. 280 (Fed. Cir. 2011)).

On October 18, 2011, the parties filed cross-motions for summary judgment. Docs. 474, 475. Move sought summary judgment on all infringement claims, arguing that "Move did not perform all steps of the claimed method and exercised neither direction nor control over users who may have performed those steps so as to render it liable for joint infringement." Doc. 476 at 32. We agreed, and granted summary judgment for Move. Doc. 493.

REAL appealed. Doc. 501. The Federal Circuit affirmed our conclusion that Move could not be liable for direct infringement, but remanded for us to consider whether Move might be liable for induced infringement. Doc. 511 (published at *Move, Inc. v. Real Estate All. Ltd.*, 709 F.3d 1117 (Fed. Cir. 2013)). Thereafter, the Supreme Court decided *Limelight Networks, Inc. v. Akamai Techs., Inc.*, — U.S. —, 134 S.Ct. 2111, 189 L.Ed.2d 52 (2014), holding that a party could not be liable for inducing infringement if no party directly infringed the patent. *Id.* at 2115. We concluded that this decision totally undermined the Federal Circuit's prior mandate, and reinstated our entry of summary judgment. Doc. 522. REAL appealed again. Doc. 529. The

Federal Circuit summarily affirmed. Doc. 536. REAL petitioned for rehearing, and the Federal Circuit granted this petition, vacated its prior affirmance, and remanded the matter to us for further consideration in light of *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015) (en banc). Doc. 537 at 3. In doing so, the Federal Circuit expressed "no opinion on the question of whether [REAL] has waived any allegations of divided infringement." *Id.*

On April 25, 2016, we held that REAL had waived the divided direct infringement argument, and reinstated our grant of summary judgment in favor of Move. Doc. 563. We asked the parties to submit a Joint Status Report, which they did. Doc. 564. Based on this report, we concluded that "resolution of the remaining summary judgment issues would be the most expeditious manner of proceeding." Doc. 565. We also agreed with Move that "resolution of any issues related to *Alice Corp. Pty. Ltd. v. CLS Bank International*, — U.S. —, 134 S.Ct. 2347, 189 L.Ed.2d 296 (2014)" would also be prudent. *Id.* We asked the parties to file a joint brief on the *Alice* issues, and stated that we would resolve the remaining summary judgment issues on the original briefing. *Id.* On July 15, 2016, the parties filed their joint brief on *Alice*, and Move sought summary adjudication that the '989 Patent is invalid under 35 U.S.C. § 101. Docs. 572, 573.

## II. Legal Standard

We may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, the district court's "function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249, 106 S.Ct. 2505.

The moving party bears the initial responsibility to point to the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the nonmoving party has the burden of proof at trial, the moving party can carry its initial burden either by submitting affirmative evidence that there is not a triable, factual dispute or by demonstrating that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322, 106 S.Ct. 2548. The burden then shifts to the nonmoving party "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548). This means that the evidence is such that "a jury could reasonably render a verdict in the non-moving party's favor." Id. (citing *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006) (internal quotation marks omitted). If the moving party meets its initial burden of demonstrating that summary judgment is proper, "the nonmoving party must come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis deleted; internal quotation marks omitted).

In ruling on a motion for summary judgment, we apply the "substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Patents are "presumed valid," 35 U.S.C. § 282(a), and this presumption can be overcome only by clear and convincing evidence. *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001). "Thus, a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise." Id. "Alternatively, a moving party seeking to have a patent held not invalid at summary judgment must show that the nonmoving party, who bears the burden of proof at trial, failed to produce clear and convincing evidence on an essential element of a defense upon which a reasonable jury could invalidate the patent." Id.

### III. Plaintiffs' July 15, 2016 Motion

#### A. Waiver

■■■ Move seeks summary adjudication that the '989 Patent is invalid under 35 U.S.C. § 101 because it impermissibly seeks to patent an abstract idea. Doc. 572. As a preliminary matter, we must consider whether Move waived this argument. We set forth the standard for waiver in our April 25, 2016 order:

Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it." *CBS, Inc. v. Merrick*, 716 F.2d 1292, 1295 (9th Cir. 1983); *see also United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ("[W]aiver is the 'intentional relinquishment or abandonment of a known

right.' "). Waiver can be express or implied. *Mooney v. City of N.Y.*, 219 F.3d 123, 131 (2d Cir. 2000) ("[A] waiver need not be express, but may be inferred from the conduct of the parties."). "An implied waiver of rights will be found where there is 'clear, decisive and unequivocal' conduct which indicates a purpose to waive the legal rights involved." *United States v. Amwest Sur. Ins. Co.*, 54 F.3d 601, 602–03 (9th Cir. 1995). The party asserting waiver "bears [a] weighty burden of establishing that a 'clear and unmistakable' waiver has occurred." *N.L.R.B. v. N.Y. Tel. Co.*, 930 F.2d 1009, 1011 (2d Cir. 1991).

Doc. 563 at 3 ("April 25 Order").

REAL argues that waiver occurred here because (1) Move's second amended complaint ("SAC") did not plausibly allege invalidity under § 101; (2) Move did not file a motion for summary judgment on the § 101 issue before the January 18, 2010 deadline for dispositive motions set forth in the Court's February 11, 2009 scheduling order; (3) Move did not raise the argument in response to REAL's motion for summary judgment; and (4) Move never raised the argument before the Federal Circuit. Doc. 573 at 34–35.

█ We do not find these arguments persuasive. As to REAL's first argument, the SAC alleged that "the '989 patent (and each and every claim thereof) is invalid for failure to comply with the provisions of one or more sections of the Patent Act, 35 U.S.C. §§ 1, *et seq.*" Doc. 198, ¶ 79. This allegation encompasses the argument that the '989 Patent is invalid under § 101. Thus, REAL was on notice that Move might assert this argument. *Cf. Pfizer Inc. v. Apotex Inc.*, 726 F.Supp.2d 921, 937–38

(N.D. Ill. 2010) (allegation that counter-defendant's patents were "invalid for failure to comply with one or more of the conditions of patentability set forth in Title 35 of the United States Code" was "sufficient to put [counter-defendant] on notice of what [counterclaimant] is claiming"). While Move's allegation might not satisfy the heightened pleading standard set forth in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the SAC predates *Iqbal* by approximately four months. We cannot find waiver based on Move's failure to comply with a pleading standard that had not yet been announced.[1]

As to REAL's second argument, we are aware of no authority suggesting that Move was required to move for summary judgment on its § 101 argument in order to preserve this argument. *See Street v. Corr. Corp. of Am.*, 102 F.3d 810, 816 (6th Cir. 1996) (finding "no authority" for the proposition that "failure to move for summary judgment" on an argument "amounts to a waiver" of that argument). We are particularly loathe to embrace such an argument here, given that Move's motion for summary judgment was filed before the Supreme Court's decision in *Alice*, which undeniably clarified the law in this area. To the extent REAL argues that Move's present motion is *untimely* under the February 11, 2009 scheduling order, that order was superseded by our May 16, 2016 order requiring the parties to file "a joint brief presenting the merits of any *Alice* arguments." Doc. 565.

REAL's remaining arguments are no more persuasive. REAL sought summary judgment on three issues: (1) whether

---

1. As Move notes, it was unclear prior to *Iqbal* whether the pleading standard announced in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) was applicable outside of the antitrust context. The Court in *Twombly* indicated that it was addressing the "question of what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act." *Id.* at 545–55, 127 S.Ct. 1955.

the '989 Patent was anticipated by certain references; (2) whether these references were prior art; and (3) whether Inventor Tornetta engaged in inequitable conduct before the U.S. Patent and Trademark Office ("PTO"). Doc. 474. In its appeals to the Federal Circuit, REAL challenged this Court's claim construction, our ruling on direct infringement, and our ruling on induced infringement. *See* Docs. 450, 511, 537. None of the issues previously raised by REAL implicates § 101. Nor is there evidence that REAL affirmatively argued that the '989 Patent was valid under § 101, either in its summary judgment motion or on appeal. Absent any affirmative argument by REAL, Move's silence cannot be understood as waiver of the argument that the '989 Patent is invalid under § 101.

The fact that REAL never affirmatively asserted that the '989 Patent was valid under § 101 distinguishes our April 25 Order. There, we found that REAL waived its theory of divided direct infringement. Doc. 563. As we explained, even after Move "placed the issue of divided direct infringement *squarely before this court*" by arguing in its motion for summary judgment that this type of infringement could not have occurred, REAL failed to assert that such infringement had occurred. *Id.* at 3 (emphasis added). Later, Move sought to delay proceedings pending the Federal Circuit's *en banc* decision in *Akamai*, which was expected to clarify the standard for divided direct infringement. *Id.* at 4 (citing Doc. 447). REAL vigorously opposed, arguing that the decision would have "[no] relevance" because "REAL is prepared to show that Move directly performed every step of the claim." *Id.* at 5 (citing Doc. 448 at 3–4). Thus, REAL explicitly disclaimed any intention to pursue a theory of divided direct infringement. Move did not make a comparable disclaimer here; the § 101 issue simply was not raised by either party. Because we find that Move did not waive the § 101 argu-

ment, we proceed to consider the merits of Move's argument.

## B. The *Alice* Test
### 1. General Principles

■ Section 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent thereof, subject to the conditions and requirements of this title." 35 U.S.C. § 101. This provision "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 134 S.Ct. at 2354 (citation and quotation marks omitted). The Supreme Court has developed a two-part framework to determine whether a claim is subject to this implicit exception. Under this framework, we begin by asking whether the relevant claims are directed to a patent-ineligible concept. *Id.* at 2355 (citing *Mayo Collaborative Servs. v. Prometheus Labs.*, Inc., 566 U.S. 66, 132 S.Ct. 1289, 1296–97, 182 L.Ed.2d 321 (2012)). If so, we proceed "to consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.* (quoting *Mayo*, 132 S.Ct. at 1297–98; quotation marks omitted).

■ The first step of the *Alice* inquiry is intended to be a meaningful one. Even though "[a]ll inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas," *Mayo*, 132 S.Ct. at 1293, not every invention is *directed* to a patent-ineligible concept. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). To distinguish claims that are *directed* to abstract ideas from those that merely *involve* abstract ideas, we look to "the 'focus' of the claims" and "their 'char-

acter as a whole.'" *Elec. Power Grp., LLC v. Alstom, S.A.*, 830 F.3d 1350, 1354 (2016) (citations omitted). If the essential features of the claim derive their meaning from a particular technical context and resist transplantation to other contexts, the claim is non-abstract. If, on the other hand, these features are readily transferrable across technical contexts, the claim is directed to an abstract idea. *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016) ("The abstract idea exception prevents patenting a result where 'it matters not by what process or machinery the result is accomplished.'") (quoting *O'Reilly v. Morse*, 56 U.S. 62, 113, 15 How. 62, 14 L.Ed. 601 (1854)). Similarly, if the essential features of the claim can be implemented within the human mind or with pen and paper, the claim is directed to an abstract idea. *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372–73 (Fed. Cir. 2011).

If the relevant claims are directed to an abstract idea, we proceed to the second step of the *Alice* inquiry. Here, we look for an "inventive concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 134 S.Ct. at 2355 (quoting *Mayo*, 132 S.Ct. at 1294; quotation marks omitted; alterations incorporated). An artificial attempt by the drafter "to limit the use of the [abstract idea] to a particular technological environment" is not enough. *Mayo*, 132 S.Ct. at 1297 (quotation marks and citation omitted). Nor will it suffice to "append[ ] ... well-understood, routine, conventional activities previously engaged in by workers in the field." *Intellectual Ventures I LLC v. Symantec Corp.* ("Syman-

tec Corp."), 838 F.3d 1307, 1313 (Fed. Cir. 2016) (quoting *Alice*, 134 S.Ct. at 2357, 2359; quotation marks omitted; alterations incorporated). However, an inventive concept may exist where the claim includes a "non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

A comparison of two Supreme Court cases illustrates the type of analysis we perform when confronted with an abstractness challenge.[2] In *Diamond v. Diehr*, 450 U.S. 175, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981), the relevant claims required a computer to perform "a well-known mathematical equation" as part of a broader process for curing rubber. *Id.* at 187, 101 S.Ct. 1048. The Court held that the claims were patent eligible, notwithstanding their use of an abstract equation, because they "used the equation in a process designed to solve a technological problem in 'conventional industry practice.'" *Alice*, 134 S.Ct. at 2358 (quoting *Diehr*, 450 U.S. at 178, 101 S.Ct. 1048). The equation was useful only insofar as it was employed in connection with "all of the other steps in the[ ] claimed process"—"installing rubber in a press, closing the mold, constantly determining the temperature of the mold, constantly recalculating the appropriate cure time through the use of the formula and a digital computer, and automatically opening the press at the proper time." *Diehr*, 450 U.S. at 178, 101 S.Ct. 1048. Because the key improvements identified in these claims were integrated into a particular technical context, the claims were patent eligible. *See Mayo*, 132 S.Ct. at 1298 (process at issue in *Diehr* was patent eligible "because ... the additional steps

---

**2.** Although both cases predate *Alice,* they employ the same basic analytical framework, and are therefore instructive. *See McRO,* 837

F.3d at 1312 (Supreme Court cases that preceded the two-step framework may nonetheless provide guidance).

of the process integrated the equation into the process as a whole").

In *Bilski v. Kappos*, 561 U.S. 593, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010), by contrast, the relevant claims set forth "a series of steps instructing how to hedge risk," and then offered "a simple mathematical formula" for applying these steps. *Id.* at 599, 130 S.Ct. 3218. The claims went on to explain how buyers and sellers in the energy market could apply these concepts. *Id.* The Court found that hedging—a well-known concept used across fields—was an abstract idea, and that the relevant claims failed to anchor this idea to any particular technical context. *See id.* at 611–12, 130 S.Ct. 3218 (claims added nothing to underlying idea except "well-known random analysis techniques"). Accordingly, the Court concluded that the claims were not patentable. *Id.* at 612, 130 S.Ct. 3218.

### 2. Applying *Alice* to Computer–Related Claims

■■■■ When computer-related claims are at issue, step one of the *Alice* inquiry "asks whether the focus of the claims is on the specific asserted improvement in computer capabilities ... or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish*, 822 F.3d at 1335–36. Claims that involve the improvement of computer functionality are patent eligible. *See, e.g., McRO*, 837 F.3d at 1314 (claims "focused on a specific asserted improvement in computer animation" were non-abstract); *Enfish*, 822 F.3d at 1339 (method for improving "the way a computer stores and retrieves data in memory" was non-abstract); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed.

Cir. 2014) (method for website operation that involved "generat[ing] and direct[ing] the visitor to [a] hybrid web page that present[ed] product information from the third-party and visual 'look and feel' elements from the host website" was non-abstract). "Software can make non-abstract improvements to computer technology just as hardware improvements can." *Enfish*, 822 F.3d at 1335. Claims that involve improvements to computer functionality are patent eligible because they derive their meaning from the particular context of computing, resist transfer to other technical contexts, and cannot be implemented within the human mind.

■■■■ On the other hand, claims that involve the use of a computer to perform ordinary mental processes are directed to an abstract idea. *See, e.g., FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1095–96 (Fed. Cir. 2016) (computerized method for analyzing records of human activity to detect suspicious behavior "merely implement[ed] an old practice in a new environment," and was therefore abstract). When confronted with claims of this type, we must proceed to step two of the *Alice* inquiry and "scrutinize" the technical aspects of the claim "more microscopically." *Elec. Power Grp.*, 830 F.3d at 1354. "Steps that do nothing more than spell out what it means to 'apply it on a computer' cannot confer patent-eligibility." *Intellectual Ventures I, LLC v. Capital One Bank (USA) ("Capital One")*, 792 F.3d 1363, 1370–71 (Fed. Cir. 2015) (quoting *Alice*, 134 S.Ct. at 2359).[3] Nor does "claiming the improved speed or efficiency inherent with applying the abstract idea on a computer provide a sufficient inventive concept." *Id.*

---

3. *See also Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715–16 (Fed. Cir. 2014) (instructions "to implement the abstract idea with routine, conventional [computing] activity" do not provide an inventive concept); *Symantec Corp.*, 838 F.3d at 1315 ("Claims that

amount to nothing significantly more than an instruction to apply an abstract idea using some unspecified, generic computer ... do not make an abstract idea patent-eligible") (quoting *Alice*, 134 S.Ct. at 2359–60).

at 1367. Rather, the claim must "reflect[ ] a specific implementation not demonstrated as that which any [programmer] engaged in the search for [a means of implementing the abstract idea] would likely have utilized." *McRO*, 837 F.3d at 1316 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, — U.S. —, 133 S.Ct. 2107, 2119–20, 186 L.Ed.2d 124 (2013)); *see BASCOM*, 827 F.3d at 1350 (novel arrangement of software elements to filter internet content, which provided "a technical improvement over prior art ways of filtering such content," provided inventive concept).

## C. Analysis

### 1. *Alice* Step One

Turning to the merits, we begin by asking whether the '989 Patent is directed to an abstract idea. Move argues that it is directed to such an idea: specifically, the idea of "locating available real estate that meets one's geographic and other criteri[a]." Doc. 573 at 15. REAL accuses Move of overgeneralizing the invention. It argues that Patent '989 is directed to: "a method for transforming a database of available real estate properties into a computer display of a zoomed second area, where the information is displayed at a higher level of detail than a previous display, and the points displayed represent

the locations of available real estate properties." *Id.* at 32.

■ As an initial matter, we must decide the appropriate level of generality at which to view the '989 Patent. Some decisions of the Federal Circuit have instructed courts applying *Alice* step one to be " 'careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims." *McRO*, 837 F.3d at 1313 (quoting *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016)); *see also Enfish*, 822 F.3d at 1327 ("[D]escribing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule."). However, a review of *Alice* itself, and recent Federal Circuit decisions applying it, indicate that courts routinely describe claims at a high level of generality at *Alice* step one.[4] We therefore agree with a prior decision of this Court that *Alice* step one requires us to "recite a claim's purpose at a reasonably high level of generality." *Secure Mail Sols. LLC v. Universal Wilde, Inc.*, 169 F.Supp.3d 1039, 1048 (C.D. Cal. 2016) (citation and quotation marks omitted); *cf. BASCOM*, 827 F.3d at 1349 (recognizing that analysis of specific limitations can occur at either step).

---

4. *See Alice*, 134 S.Ct. at 2356 ("On their face, the claims before us are drawn to the concept of intermediated settlement, i.e., the use of a third party to mitigate settlement risk."); *see, e.g.*, *FairWarning IP*, 839 F.3d at 1093 (claims were directed to "concept of analyzing records of human activity to detect suspicious behavior"); *Symantec Corp.*, 838 F.3d at 1313 (claim directed to "receiving e-mail ... identifiers, characterizing e-mail based on the identifiers, and communicating the characterization") *Elec. Power Grp.*, 830 F.3d at 1353 ("The focus of the asserted claims ... is on collecting information, analyzing it, and displaying certain results of the collection and

analysis."); *BASCOM*, 827 F.3d at 1348 (claims "directed to filtering content on the Internet"); *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324 (Fed. Cir. 2016) ("asserted claims [were] directed to the abstract idea of 'anonymous loan shopping' "); *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1333 (Fed. Cir. 2015) (claims directed to "the abstract idea of determining a price, using organizational and product group hierarchies"); *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015) (claim directed to "the idea of retaining information in the navigation of online forms").

In deciding what the '989 Patent is directed to, we consider the Abstract and the language of the sole independent claim, Claim 1. The Abstract describes the invention as "a method for locating available real estate properties for sale, lease or rental using a database of available properties at a central location and remote stations which use a graphic interface to select desired regions on a map of the areas of interest." Claim 1 discloses "[a] method using a computer for locating available real estate properties" comprising steps for "creating a database" of available properties, representing this information on a digital map, and allowing the user to "select a[n] ... area" and "zoom[ ] in ... to display a higher level of detail." We therefore conclude that the '989 Patent is directed to a method for collecting and organizing information about available real estate properties and displaying this information on a digital map that can be manipulated by the user.

Based on this understanding, we conclude that the '989 Patent is directed at an abstract idea. The Federal Circuit has explained that "collecting information, including when limited to particular context," is "within the realm of abstract ideas." *Elec. Power Grp.*, 830 F.3d at 1353. Methods for "analyzing information" that rely on "steps people go through in their minds" or "mathematical algorithms" are also abstract. *Id.* at 1354; *accord Amdocs (Israel) Limited v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300 (Fed. Cir. 2016) ("claims involving the mere collection and manipulation of information do not satisfy § 101") (citations omitted). It follows that the concept of collecting and organizing data about available real estate properties is abstract.

The requirement that the information be displayed on a digital map is also abstract.

The Federal Circuit has explained that "merely presenting the results of abstract processes of collecting and analyzing information ... is abstract as an ancillary part of such collection and analysis." *Elec. Power Grp.*, 830 F.3d at 1354. Nothing about the display requirement renders Claim 1 non-abstract. The concept of using a map to display geographic information is ancient;[5] it is certainly "part of the storehouse of knowledge of all men" which is "free to all men and reserved exclusively to none." *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130, 68 S.Ct. 440, 92 L.Ed. 588 (1948). The fact that the map is digital, rather than physical, does not change the analysis. The '989 Patent relies on generic computing capabilities to render the map. *See* Doc. 575-1 at 23 ("[T]he present invention may be implemented on an IBM or compatible personal computer" using a variety of existing softwares); *see also id.* at 41 (Patent Examiner: "It is well known in the prior art of computer to display information textually or graphically."). Generic computer implementation of this sort does not defeat a finding of abstractness. *See, e.g., Symantec Corp.*, 838 F.3d at 1315.

Finally, the requirement that the user be able to manipulate the map to obtain more detailed information—i.e., that the user be able to "select a[n] ... area" and "zoom[ ] in ... to display a higher level of detail"—is also abstract. To begin, we note that the concept of using a series of related maps that provide progressively greater detail is an abstract idea. As the Eastern District of Virginia noted in a similar case, "atlases have long provided maps of large geographic areas along with corresponding maps of smaller portions of these larger areas in more detail." *Peschke Map*

---

5. The oldest known map, the Imago Mundi, dates to the 6th Century BCE. *See* http://www. britishmuseum.org/research/collection_online/ collection_object_details.aspx?assetId= 404485001&objectId=362000&psrtId=1.

*Techs. LLC v. Rouse Properties Inc.*, 168 F.Supp.3d 881, 888 (E.D. Va. 2016). Organizing geographic data in this way is commonsensical—it is the type of approach anyone attempting to organize a large amount of geographic data would think to use. Allowing a user to orient herself using a larger map, and then to select a smaller, more detailed map corresponding to her geographic preference, is similarly commonsensical. All of these steps could be approximated by a realtor with an atlas.

Of course, even if the process is abstract, the claim may be directed to a patent-eligible subject if it discloses "a specific asserted improvement in computer [performance]" designed to implement the process. *McRO*, 837 F.3d at 1314. But we see no evidence that the '989 Patent discloses such an improvement. Claim 1 does not teach any innovation in computer functionality; instead, it speaks of performing generic functions such as "creating a database," "zooming in" on a selected area, and "displaying a map." REAL argues that steps such as "zooming to display a higher level of detail" cannot be performed without a computer (Doc. 573 at 41–42) and that the process as a whole requires a computer to be "programmed to operate in a specific manner," (*id.* at 38), but that is not enough: claims involving software are often found to be abstract where they rely on "routine, conventional [computing] activity." *See, e.g., Ultramercial*, 772 F.3d at 715–16. There is nothing to indicate that the computer activity disclosed by the '989 Patent is anything other than routine. Although the '989 Patent discloses pages of logical flow charts that explain how the computer should be programmed to perform the claimed method (Doc. 571 at 3–15), REAL does not explain how the disclosed program differs from that which any programmer would have used to implement the claimed method. *Cf. McRO*, 837 F.3d at 1316.[6]

Comparing the '989 Patent to one of the patents at issue in *Enfish*, where the Federal Circuit upheld a software patent against an abstractness challenges at *Alice* step one, demonstrates what is lacking here. The patents in *Enfish* were directed to the use of a self-referential table to organize data. *Enfish*, 822 F.3d at 1336. One of the claims recites:

> A data storage and retrieval system for a computer memory, comprising: means for configuring said memory according to a logical table, said logical table including: a plurality of logical rows, each said logical row having an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information; a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column having an OID to identify each said logical column; and wherein at least one of said logical rows has an OID equal to the OID of a corresponding one of said logical columns, and at least one of said logical rows includes logical column information defining each of said logical column.

Claim 1 of U.S. Patent No. 6,151,604 (the "'604 Patent"). The '604 Patent goes on to identify several benefits associated with the use of a self-referential table. First, the claimed method is compatible with "an indexing technique that allows for faster searching of data" than would be possible using the conventional method of organizing data in tabular form. *Enfish*, 822 F.3d

---

**6.** Similar flow charts appear in many software patents that have been invalidated on abstractness grounds. Consider Figure 4 of U.S. Patent No. 6,460,050, which was held invalid in *Symantec Corp.*, 838 F.3d at 1313, or Figure 2 of U.S. Patent No. 8,578,500, held invalid in *FairWarning*, 839 F.3d 1089.

at 1333 (citation omitted). Second, the claimed method "allows for more effective storage of data other than structured text, such as images and unstructured text." *Id.* (citation omitted). Finally, the claimed method "allows more flexibility in configuring the database," because the database can be launched without first configuring a series of related tables. *Id.* (citation omitted).

Thus, the patent in *Enfish* speaks directly to a particular method of organizing data on a computer. The benefits it provides—faster searching, more effective storage of images and unstructured text, and more flexibility in table configuration—can only be realized, and only make sense, in the computing context. The logical structure is decidedly novel, with no precursor in the pre-computer world. And crucially, the method is not one that any programmer seeking to perform the relevant function would have known to design; to the contrary, the evidence before the Federal Circuit indicated that programmers had traditionally relied on a different method to organize data in tabular form. All of these features distinguish the '604 Patent from the '989 Patent.

## 2. *Alice* Step Two

We proceed to step two of the *Alice* inquiry. Here, we "scrutinize" the technical aspects of the '989 Patent "more microscopically," *Elec. Power Grp.*, 830 F.3d at 1354, to determine whether the Claim includes an inventive concept "sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 134 S.Ct. at 2357 (citing *Mayo*, 132 S.Ct. at 1294, 1295).

REAL presents two arguments as to why the '989 Patent contains an inventive concept. First, REAL argues that the '989 Patent discloses "a particular way of improving the function of a computer to provide ease and speed of search and retrieval of information from a database of available real estate properties." Doc. 573 at 49. This argument is a non-starter. There is no evidence that the '989 Patent improves computer functionality; to the contrary, the specification teaches that the claimed method relies on generic computing capabilities. *See* Doc. 575–1 at 23 ("[T]he present invention may be implemented on an IBM or compatible personal computer" using a variety of existing softwares). The fact that this generic computer implementation may increase the ease and speed of search and retrieval of information does not provide an inventive concept. *See Capital One*, 792 F.3d at 1370–71 ("the improved speed or efficiency inherent with applying the abstract idea on a computer" is not an inventive concept).

Second, REAL argues that zooming to display a higher level of detail is an inventive concept. It cites a declaration from its expert, Professor Dennis E. Shasha, stating that "[i]t was considered neither routine nor conventional in the mid–1980s for a computer-displayed map to be able to zoom to display a higher level of detail." Doc. 573 at 44 (Doc. 575–3 at 4, ¶ 12). Although we accept that as true,[7] we do not see it as evidence of an inventive concept. As explained, the concept of using a series of related maps that provide progressively greater detail is an abstract

---

7. There is evidence that zooming in general was known in the art. *See* Doc. 575–1 at 148 (Patent Examiner: "As to the zoom feature ... that too is known. Waller, for example, teaches a means for providing the operator with a large scale map. The operator may specify a region within the large scale map by positioning a window at the center of the desired region. The system will zoom in on the designated region and provide a close-up map of the region."). REAL contends, and we see no evidence to the contrary, that the '989 Patent was among the first to teach a *dynamic* zoom—one providing more detail, not simply a larger display, as the user zooms in. *See* Doc. 573 at 45.

idea, and a zoom feature on a digital map is a commonsensical way to implement this abstract idea on a computer. *Accord Peschke Map*, 168 F.Supp.3d at 888 ("[T]he use of multiple layers of maps that enables users to zoom into and out of a geographic area is an unpatentable abstract idea."). Whether the '989 Patent was the first attempt to implement this idea on a computer is of no relevance. As the Supreme Court has explained, "the fact that a company may be the first to successfully apply an abstract idea within a new technological context does not transform the abstract idea into something tangible and patentable." *Bilski*, 561 U.S. at 610–11, 130 S.Ct. 3218.

REAL does not identify anything else that might constitute an inventive concept. Nor do we see anything. REAL has not identified any improvement to computer functionality. Nor does it identify a "non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM*, 827 F.3d at 1350. It appears to us that the '989 Patent provides instructions to implement an abstract idea "with routine, conventional [computing] activity." *Ultramercial*, 772 F.3d at 715–16. Therefore, we hold that the implicit exception against patenting abstract ideas applies to the '989 Patent, and that Move is entitled to summary adjudication that the '989 Patent is invalid under § 101.

### III. Defendants' October 18, 2011 Motion

#### A. Anticipation

An invention is not patentable if it was anticipated—that is, if it was "patented, described in a printed publication, or in public use, on sale, or otherwise available to the public" before the priority date of the claimed invention. 35 U.S.C. § 102(a)(1). "Anticipation requires that all of the claim elements and their limitations are shown in a single prior art reference."

*In re Skvorecz*, 580 F.3d 1262, 1266 (Fed. Cir. 2009). It is not necessary that every element be explicitly disclosed; anticipation can also occur by implication. *See Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1369 (Fed. Cir. 1991). However, whether the disclosure is explicit or implicit, it must be "sufficient to enable one with ordinary skill in the art to practice the invention." *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002). "Anticipation is a question of fact," *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed. Cir. 1995), and must be established by clear and convincing evidence. *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 147 F.3d 1374, 1378 (Fed. Cir. 1998).

REAL seeks summary adjudication that the '989 Patent is not anticipated. Docs. 474. REAL argues that Move cannot demonstrate anticipation because (1) none of the alleged anticipating references discloses all of the steps of the claimed method and (2) none of the allegedly anticipating references was publicly available before the relevant priority date. Doc. 476 at 15–19, 21–27. We consider each argument in turn.

#### 1. Disclosure

Move argues that the '989 Patent is anticipated by two sets of references, "MIDAS/MapInfo" and "Workplace." The MIDAS/MapInfo references were developed by Navigation Technologies, Inc. ("Navigational Technologies"). Doc. 482–22 at 407, ¶ 3. The Workplace references were developed by Inventor Tornetta, pursuant to a license agreement between REAL and Synermation, Inc. ("Synermation"). Doc. 482–11 at 95–121. REAL argues that none of these references is anticipating because none teaches Step (a) of Claim 1, "creating a database of the available real estate properties." Doc. 476 at 17–19.

With respect to the MIDAS/MapInfo references, REAL argues that none of these references teaches creating a database of available real estate properties because none of them actually works. In support of this argument, REAL cites testimony from Move's expert Professor Todd S. Bacastow stating that: (1) he had to create his own database to operate MIDAS Version 1.2[8] because otherwise he "couldn't get [it] to run;" (2) he was not aware of anyone who performed all elements of Claim 1 using MIDAS Version 1.2 before the effective filing date of the '989 Patent; (3) he was "unable to run" any version of MapInfo Version 2.0 he received; and (4) he was "unaware of any version of MapInfo Version 2.0 that will run." Doc. 482–9 at 82–83, 91, 48–50. Move does not meaningfully respond to these arguments.

■ We agree with REAL that no reasonable jury could find by clear and convincing evidence that MapInfo Version 2.0 anticipates the '989 Patent, given Move's failure to produce any evidence that this program is functional. REAL is therefore entitled to summary adjudication that MapInfo Version 2.0 does not anticipate the '989 Patent. However, we think REAL mischaracterizes Professor Bacastow's testimony regarding MIDAS Version 1.2. Professor Bacastow testified that he was able to create a database using MIDAS Version 1.2 and to perform all of the steps of Claim 1 using this software. Doc. 482–9 at 89–90. He further testified that this software was "intended for and in fact probably used to look at available real estate properties." Id. at 90. Based on this testimony, a reasonable jury could find by clear and convincing evidence that MIDAS Version 1.2 teaches creating a database of available real estate properties. REAL is not entitled to summary adjudication on the question whether MIDAS Version 1.2 anticipates the '989 Patent.

With respect to the Workplace references, REAL argues that none of these references anticipates the '989 Patent because none includes routines or language for creating a database of properties. REAL cites testimony from Move's expert Professor Peter Guth, who stated that the Workplace software he reviewed "would never have created a database because the database would have been created on the host. The Workplace software ... was designed for a person or the Realtor to query the properties that had been created with another program in the database." Doc. 482–19 at 116. Professor Guth acknowledged that he had no evidence that such a program existed, but explained that "you could have created that database as simply as going into a word processor or a spreadsheet." Id. at 116–17. REAL also cites testimony from Professor Bacastow, who stated that the Workplace software he examined could not plot a plurality of points because it "was not provided with a database." Doc. 482–9 at 57–58. Move responds by accusing REAL of mischaracterizing the testimony of Professors Guth and Bacastow. Doc. 476 at 20, n.3.

Reading the cited testimony in context, we conclude that a reasonable jury could find by clear and convincing evidence that Workplace teaches creating a database. It is undisputed that the Workplace software reviewed by Professors Guth and Bacastow did not include a database or code for creating a database. But both professors testified that the software was designed to operate with a database. For example,

---

**8.** Some but not all of the testimony distinguishes between two versions of MIDAS Version 1.2—MIDAS V1.22S and MIDAS V1.22UM. As the testimony and briefing often fail to distinguish between the two versions, we ignore the distinction for present purposes.

Professor Guth testified that "[t]he source code has lines of code in it that would have plotted the properties from [a] database" had one been supplied; he went on to state that "it would have been virtually impossible to write the program without having a test database that would be plotting properties when you did that." Doc. 482–19 at 118; *accord* Doc. 482–19 at 10, n.12 (Professor Guth's expert report). Professor Bacastow testified similarly: "looking at the code we were given in hard copy format, it was quite clear that in fact it was intended to have a database." Doc. 482–9 at 58. Based on this evidence, a reasonable jury could find by clear and convincing evidence that creating a database is necessarily implied by the Workplace references. REAL is not entitled to summary adjudication on the question whether Workplace anticipates the '989 Patent.

### 2. Public Availability

The second part of REAL's motion argues that REAL is entitled to summary adjudication on the § 102 issue because neither MIDAS Version 1.2 nor Workplace was publicly available before the priority date of the '989 Patent. First, REAL argues that the '989 Patent is entitled to a priority date based on the effective filing date of the '576 Patent—i.e. March 19, 1986. There is no dispute that anticipation could not have occurred if REAL is correct. Second, REAL argues that it is entitled to summary adjudication even if the '989 Patent has a priority date based on the effective filing date of the '989 Patent (April 24, 1989), because Move has not produced evidence that the allegedly anticipating references were publicly available at the relevant time.

#### a. Is the '989 Patent Entitled to the '576 Patent's Priority Date?

The '989 Patent is a continuation-in-part ("CIP") of the '576 Patent. A CIP application is entitled to the priority date of the parent application if the parent disclosed every element claimed by the CIP in the manner required by section 112(a). 35 U.S.C. § 120. "Subject matter that arises for the first time in the CIP application does not receive the benefit of the filing date of the parent application." *Augustine Med., Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1302 (Fed. Cir. 1999). To determine whether a CIP claim is entitled to the priority date of the parent application, we ask whether the disclosure in the parent "reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter." *Id.* (citation omitted; alteration incorporated). "This is a question of fact." *Id.* at 1303.

REAL argues that the '989 Patent is entitled to the priority date of the '576 Patent because the patent examiner specifically concluded as much. If the examiner finds that the CIP application is entitled to the parent's priority date, we presume this finding is valid, absent clear and convincing evidence that it is erroneous. *See Bone Care Int'l, LLC v. Pentech Pharm., Inc.*, 741 F.Supp.2d 865, 872–73 (N.D. Ill. 2010). If the examiner did not make such a determination, the burden is on the patent holder to show that the CIP patent is entitled to the parent's priority date. *Id.* at 873 (citation omitted). "Whether the examiner actually considered this issue can only be determined by reviewing the prosecution history." *In re NTP, Inc.*, 654 F.3d 1268, 1278 (Fed. Cir. 2011).

REAL argues that the examiner was required to make a priority determination because the record included two references created after the effective filing date of the '576 Patent but before the effective filing date of the '989 Patent. *See* Doc. 482–4 at 115. REAL contends that the examiner found that these references could be disregarded because they post-

dated the effective filing date of the '989 Patent. In support of this argument, REAL points to the patent examiner's statement that "[t]he newly-cited art is considered relevant to applicant's disclosure, *but does not qualify as prior art.*" *Id.* at 111 (emphasis added). We do not think this vague, conclusory statement is sufficient to establish that the patent examiner found the '989 Patent entitled to the priority date of the '576 Patent. There is "no evidence that the examiner actually considered whether the claims of the ['576 Patent] satisfy the requirements of § 112;" the examiner certainly did not "make an affirmative statement that the claims of the ['576 Patent] satisfied § 112." *In re NTP*, 654 F.3d at 1278–79. Absent such evidence, we cannot presume that the '989 Patent is entitled to the priority date of the '576 Patent.[9]

■ REAL argues in the alternative that the '576 Patent teaches every element of Claim 1 of the '989 Patent. Move disagrees, arguing that the '576 Patent fails to disclose element (g) of Claim 1—displaying a plurality of points. Doc. 476 at 42–45. Move points to testimony from Professor Bacastow, who opined that the method set forth in the Appendix of the '576 Patent would not display a plurality of points because any point shown on a screen would be cleared before the user could access a second listing. Doc. 482–26 at 182–86. REAL counters with testimony from its expert, Professor Shasha, who opined that the '576 Patent discloses Step (g) because (1) the '576 Patent allows a user to position a crosshair cursor to "cre-

ate[ ] a point representing the appropriate geographic location of a real estate property," and (2) "[r]epeated application of this process would result in displaying a plurality of such points because there is no erasure of such points and no clear screen" in the program. Doc. 482–12 at 111–12. We think the disagreement between Professors Bacastow and Shasha creates a genuine dispute of material fact as to whether '989 Patent is entitled to the priority date of the '576 Patent.

**b. Were the Allegedly Anticipating References Publicly Available At the Relevant Time?**

■ REAL argues that, even if Move is correct regarding the priority date for the '989 Patent, the '989 Patent was not anticipated because neither MIDAS Version 1.2 nor Workplace was publicly available before the relevant priority date.[10]

**i. MIDAS Version 1.2**

With respect to MIDAS Version 1.2, REAL points to Professor Bacastow's testimony that he had "no knowledge of invoices or actual sales" for MIDAS Version 1.2, nor any other "direct evidence" that the software was delivered to a customer before April 24, 1989. Doc. 482–9 at 35, 73–74, 80–81, 98–99. In addition, REAL cites testimony from Barry Indyke, a software engineer at Navigation Technologies. Although Indyke testified that he "know[s]" Navigational Technologies had customers for MIDAS Version 1.2 in 1987 and that it would "surprise [him]" if the first sales

---

**9.** Even if we were to adopt this presumption, it would not affect our ultimate conclusion. Move has presented evidence from which a reasonable jury could find by clear and convincing evidence that the '576 Patent does not disclose every step of Claim 1 of the '989 Patent. *See* Doc. 482–26 at 182–86.

**10.** Because MIDAS was developed by a third-party, the priority date is the effective filing date of the '989 Patent, or April 24, 1989. 35 U.S.C. § 102(a)(1). Because Workplace was developed by Inventor Tornetta, the priority date is one year earlier. § 102(b)(1) (disclosures made by the inventor up to a year before the effective filing date are not considered prior art).

were after that year, he conceded that he does not have sales documentation to support his recollection. Doc. 482–6 at 79.

Move counters with a declaration from John Haller, co-founder and former Vice President for Software Development of Navigational Technologies. Haller avers that the MIDAS program was offered for sale "[a]t least as early as July 1986," and that "Version 1.2 of the MIDAS program was offered for sale and sold beginning in March 1987." Doc. 482–22 at 407–09, ¶¶ 6, 11. Haller attaches two documents to his declaration: (1) a sales presentation on the MIDAS software given to the Albany Board of Realtors in July 1986, and (2) the user manual for MIDAS Version 1.2, which states that it is for use "with the MIDAS Version 1.2 software release of August 1987." Doc. 482–23 at 2–26, 40.

Based on the Haller declaration and the corroborating evidence attached thereto, as well as the testimony of Barry Indyke, a reasonable jury could find by clear and convincing evidence that MIDAS Version 1.2 was publicly available before April 24, 1989. We therefore deny REAL's motion for summary adjudication on the question whether MIDAS Version 1.2 anticipates the '989 Patent.

### ii. Workplace

REAL argues that Workplace was not publicly available before the relevant priority date (here, April 24, 1988) because the software was maintained in confidence in accordance with the terms of the license agreement ("Agreement") between REAL and Synermation. REAL relies on a provision of the Agreement stating that Synermation will "hold all technical information ... furnished by [REAL] in confidence and will not disclose such technical information ... to others without prior written permission received from [REAL]." Doc. 482–11 at 101, ¶ 2.8.

Move disputes REAL's understanding of this provision. Move notes that the agreement defines the term "technical information" to include "system overview, flowcharts, and executable object code ... relating to the manufacture, use and testing of" Workplace, but not to include Workplace itself. *See id.* at 97, ¶1.6. Move also points to provisions of the Agreement that contemplate public distribution of the software. *See, e.g., id.* at 102, ¶3.1 (granting Synermation "the exclusive worldwide right and license to use the technical information to operate, reproduce, distribute, market, franchise, sublicense, and support" Workplace). Finally, Move cites Inventor Tornetta's testimony that he and Synermation gave free copies of the software to anyone who asked for it. Doc. 482–22 at 71, 116. Reviewing all of this evidence, we conclude that the Agreement contemplates public distribution of the Workplace software, and that such distribution may have occurred. The confidentiality provision would not preclude a reasonable jury from finding that Workplace was publicly available before April 24, 1988.

REAL also argues that Workplace is not prior art because it "was not completed and known to work for its intended purpose" before the priority date of the '989 Patent. Doc. 476 at 25. In support of this argument, REAL presents testimony from Inventor Tornetta stating that (1) Synermation terminated the Agreement by the end of 1988 because the software failed certain tests, and (2) Tornetta "did not have a functional working version" of the software "until a month before the application of the '989 Patent." Doc. 482–6 at 16–17, 31–32.

Move points to other portions of Inventor Tornetta's testimony, where states that (1) the Workplace software was written before 1988, and (2) the software was capable of displaying a plurality of points and performing all of the other limitations of

Claim 1 of the '989 Patent. Doc. 482–22 at 113–14. In addition, Move produces an April 22, 1988 article from the *Times Herald* of Norristown, Pennsylvania, which states that Workplace is capable of "superimpos[ing] on [a] map ... a series of 'points', each of which represents at least one property in the Workplace database." Doc. 482–22 at 339. Move cites testimony from B. Jay Bagdis, the author of the *Times Herald* article, who stated that Tornetta had written "some software" by the time the article was written and the software was "probably" capable of accessing a database of real estate properties as of this time. Doc. 482–28 at 90.

Based on the evidence cited by Move, a reasonable jury could find by clear and convincing evidence that Workplace was capable of performing all of the steps of Claim 1 of the '989 Patent before April 24, 1988. A reasonable jury could also find that the software was publicly available before this date. We therefore deny REAL's motion for summary adjudication on the question whether Workplace anticipates the '989 Patent.

### 3. Conclusion

REAL seeks summary adjudication that neither the MIDAS/MapInfo nor the Workplace references anticipate the '989 Patent. REAL argues that these references fail to anticipate the '989 Patent because (1) they do not teach every element of Claim 1 of the '989 Patent and (2) they do not constitute prior art. As to REAL's first argument, we conclude that REAL is entitled to summary adjudication that MapInfo Version 2.0 does not anticipate the '989 Patent because Move has not produced any evidence that this software is capable of performing all of the steps of Claim 1. However, a genuine dispute of material fact exists as to whether MIDAS Version 1.2 or Workplace is capable of

performing these steps. Accordingly, REAL is not entitled to summary adjudication that these references fail to disclose all of the elements of Claim 1. As to REAL's second argument, we conclude that a reasonable jury could find by clear and convincing evidence that the '989 Patent is not entitled to the priority date of the '576 Patent. Finally, if a jury were to determine that the '989 Patent is not entitled to the priority date of the '576 Patent, it could reasonably find that MIDAS Version 1.2 and Workplace were publicly available before the relevant priority dates. Accordingly, we deny REAL's motion for summary adjudication that MIDAS Version 1.2. and Workplace are non-anticipating.

### B. Inequitable Conduct

 REAL moves for summary adjudication on Move's claim that the '989 Patent is unenforceable as a result of Inventor Tornetta's inequitable conduct before the PTO. "To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc). Intent and materiality are separate elements. *Id.* at 1290. To establish intent, the accused infringer must show that a specific intent to deceive is "the single most reasonable inference" supported by the evidence. *Id.* To establish materiality, the accused infringer must generally show that the patent would not have been granted but for the applicant's inequitable conduct. *Id.* at 1291.[11] Both intent and materiality must be established by clear and convincing evidence. *Id.* at 1287. If, after the close of discovery, it is

---

11. A lesser showing of materiality will suffice if the applicant engaged in "affirmative egre- gious misconduct." *Therasense,* 649 F.3d at 1292.

clear that the alleged infringer has not offered sufficient evidence of intent or materiality, summary judgment is warranted. *See, e.g., Optium Corp. v. Emcore Corp.*, 603 F.3d 1313 (Fed. Cir. 2010).

 Move contends that Inventor Tornetta committed fraud on the PTO by failing to disclose the Workplace software during prosecution of the '989 Patent. REAL argues that Move cannot establish specific intent. Doc. 476 at 30–31. We agree. Move offers no direct evidence that Tornetta specifically intended to deceive the PTO. Nor could a reasonable factfinder find such intent to be the single most reasonable inference supported by the evidence. Tornetta testified that he believed the '989 Patent application was entitled to the filing date of the '576 Patent, meaning that Workplace—developed after March 19, 1986— would not constitute prior art. Doc. 482–5 at 6–7, 15–16. That is not an unreasonable belief; as explained above, we find a factual dispute as to whether the '989 Patent is entitled to the priority date of the '576 Patent. Given Tornetta's reasonable belief that Workplace was not prior art, no reasonable jury could find by clear and convincing evidence that Tornetta had a specific intent to deceive. REAL is therefore entitled to summary adjudication that Inventor Tornetta did not engage in inequitable conduct before the PTO.

## IV. Plaintiffs' October 18, 2011 Motion

### A. Anticipation

Move seeks summary adjudication that the Workplace software anticipates the '989 Patent. Docs. 475. Move asserts that Inventor Tornetta's licensing of the Workplace software in January 1988 demonstrates that this software was on sale more than a year before April 24, 1989— the effective filing date of the '989 Patent. Doc. 476 at 40–48. As explained above, we find a genuine dispute of material fact as to whether the '989 Patent is entitled to a

priority date based on the effective filing date of the '576 Patent—March 19, 1986. If the '989 Patent is entitled to the earlier filing date, Workplace would not constitute prior art, and could not anticipate. In light of this factual dispute, we deny Move's motion for summary adjudication on the anticipation issue.

### B. Section 112

 Move seeks summary adjudication that the '989 Patent is invalid under 35 U.S.C. § 112 for lack of a written description and failure to enable. Docs. 475; 476 at 53–62. Section 112 provides that any patent shall include "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art ... to make and use the same." 35 U.S.C. § 112(a). This provision gives rise to two separate but related requirements. First, the patent "must describe the invention sufficiently to convey to a person of skill in the art that the patentee had possession of the claimed invention at the time of the application, i.e., that the patentee invented what is claimed." *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005). This is referred to as the "possession requirement." Second, the patent "must describe the manner and process of making and using the invention so as to enable a person of skill in the art to make and use the full scope of the invention without undue experimentation." *Id.* at 1344–45. This is known as the "enablement requirement." Whether the patent establishes possession is a question of fact. *PowerOasis, Inc. v. T–Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008). "Enablement is a question of law based on underlying factual findings." *In re Morsa*, 713 F.3d 104, 109 (Fed. Cir. 2013). Any attack under § 112 must be supported by clear and convincing evidence. *See Alcon*

*Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1188 (Fed. Cir. 2014); *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1364 (Fed. Cir. 2003).

Move contends that the '989 Patent fails the possession requirement because it claims all methods for selecting an area having boundaries, but describes only one such method—a technique referred to as rubberbanding. Doc. 476 at 53.[12] As Move correctly notes, a patent is invalid under § 112 if its claims are broader than the disclosure will support. *See, e.g., Lizard-Tech*, 424 F.3d at 1345 (patent was invalid under § 112 because it claimed all methods for creating a discrete wavelet transform, but disclosed only one such method). Move points to testimony from REAL's experts acknowledging that the '989 Patent does not specifically mention any method for selecting an area other than rubberbanding. *See* Doc. 482–21 at 304 (Professor Michael Dobson: "Are [other selection methods] specifically mentioned? I think I've said five times that they're not specifically mentioned, but they would be obvious to one with ordinary skill in the art."); *id.* at 458 (testimony of Professor Shasha, explaining that rubberbanding is the only method for selecting an area for which there is an "embodiment" in the patent).

REAL counters by citing language in the specification that describes methods other than rubberbanding for interacting with the program generally. The first sentence states: "There are three basic types of variables used in the system of the present invention: (1) numerical; (2) array of menu selection; and (3) floating point location." Doc. 575–1 at 20. Professor Dobson understood this sentence to imply "a variety of ways that people could interact with the system to begin a selection of an area," including "access[ing] the map through a menu." Doc. 482–21 at 301–02. The second sentence states: "Th[e] location is selected through the use of manipulator keys or pointing devices such as a mouse, light pen or other known devices which allow positioning of a graphical interface selector in order to locate both property location and distance specifications without resort to numerical data on the part of the user." Doc. 575–1 at 20. Professor Dobson understood this sentence to describe "a variety of methods of indicating areas," including "touching a map and having the map bring up the zoom area around the point." Doc. 482–21 at 302. Professor Shasha agreed that positioning a cursor and clicking was "definitely contemplated." Doc. 482–7 at 34.[13]

We conclude that the specification language cited by REAL and the corresponding expert testimony would support a reasonable jury in finding that the '989 Patent demonstrates possession of methods for choosing an area other than rubberbanding. Although Move is correct that rubberbanding is the only method specifically described as being used for selecting an area, the specification teaches other methods for interacting with the program

---

12. Rubberbanding is a technique whereby the user can "control the position and size of a 'rubberband' window box." Doc. 575–1 at 16. The rubberband "allows the user to enclose a search boundary on the map." *Id.*

13. Move argues that the reference to manipulator keys and pointing devices simply "reflects various ways to perform rubberbanding, not ways to select areas without rubberbanding." Doc. 476 at 56–57, n.22. We agree that this is the most natural reading of the sentence. *See* Doc. 575–1 at 20 (describing "use of manipulator keys or pointing devices such as a mouse, light pen or other known devices" for purposes of *"positioning of a graphical interface selector"*) (emphasis added). Even so, the sentence might establish possession if, as REAL's experts contend, it clearly implies to one skilled in the art that the same selection techniques can be used without a graphical interface selector.

generally, and REAL's experts testified that the clear implication from these teachings is that these methods can be used for selecting an area. We see no reason why a clear implication cannot support a finding of possession. *See LizardTech*, 424 F.3d at 1345 ("it is unnecessary to spell out every detail of the invention in the specification; only enough must be included to convince a person of skill in the art that the inventor possessed the invention"); *cf. Standard Havens Prods.*, 953 F.2d at 1369 ("Anticipation can occur when a claimed limitation is 'inherent' or otherwise implicit in the relevant reference.").

Turning now to enablement: we think this is one of those cases where the possession and enablement requirements "rise and fall together." *LizardTech*, 424 F.3d at 1345. Professor Dobson testified that selection techniques other than rubberbanding would be "obvious to one with ordinary skill in the art." Doc. 482–21 at 304. When a technique is obvious, simply referring to it in the specification may suffice to enable a person of skill to implement it. If a jury were to find that the specification of the '989 Patent clearly implies methods for choosing an area other than rubberbanding—as it reasonably could—it would also be justified in finding that the '989 Patent enables these techniques. Because there is a factual dispute as to whether the specification clearly implies the use of selection techniques other than rubberbanding, we deny Move's motion for summary adjudication under § 112.

### C. Willful Infringement

REAL's counterclaim asserts that Move engaged in willful infringement and seeks treble damages on that basis. Doc. 210 at 58. Move seeks summary adjudication that

REAL cannot prove willfulness. Docs. 475; 476 at 62–63.

██ Section 284 of the Patent Act provides that "the court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. This provision "gives district courts the discretion to award enhanced damages against those guilty of patent infringement." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, —— U.S. ——, 136 S.Ct. 1923, 1935, 195 L.Ed.2d 278 (2016). This discretion should be exercised only in "egregious cases of misconduct beyond typical infringement." *Id.*

██ This is not an egregious case. REAL produces no evidence that Move engaged in any "misconduct beyond typical infringement;" at most, REAL's evidence indicates that Move continued to use the allegedly infringing method after it learned of REAL's patents. But Move had several reasonable arguments as to why its conduct was non-infringing.[14] We think the reasonableness of Move's position precludes a finding of egregiousness. Move is entitled to summary adjudication on this issue.

### V. Conclusion

We have already held that Move cannot be liable for direct infringement, and the Federal Circuit affirmed this ruling. Docs. 493, 511. We subsequently held that REAL had waived the argument that Move committed divided direct infringement. Doc. 563. Based on these rulings, we granted Move summary judgment. *Id.* In order to expedite the resolution of this matter, we have considered the remaining issues identified by the parties. We rule as follows: (1) Move is entitled to summary

---

14. For example, Move understood Step (c)— "selecting a first area having boundaries"—as requiring the *user* to define the area to be selected. We initially agreed (Doc. 419 at 12), and REAL stipulated to a finding of non-infringement based on this reasonable, but erroneous, construction (Doc. 426 at 3–4).

adjudication that the '989 Patent is invalid under 35 U.S.C. § 101; (2) REAL is entitled to summary adjudication that MapInfo Version 2.0 did not anticipate the '989 Patent; (3) REAL is not entitled to summary adjudication on the question whether MIDAS Version 1.2 or Workplace anticipated the '989 Patent; (4) REAL is entitled to summary adjudication that Inventor Tornetta did not commit inequitable conduct before the PTO; (4) Move is not entitled to summary adjudication on the question whether Workplace anticipates the '989 Patent; (5) Move is not entitled to summary adjudication on the question whether the '989 Patent is invalid under 35 U.S.C. § 112; and (6) Move is entitled to summary adjudication that it did not engage in egregious conduct sufficient to give rise to treble damages under 35 U.S.C. § 284.

In light of the foregoing rulings—in particular, our ruling that the '989 Patent is invalid under 35 U.S.C. § 101—it appears to us that no further issues remain in this case. While the parties have not squarely addressed the question whether the '576 Patent is invalid under 35 U.S.C. § 101, it appears—though we do not decide—that our ruling with respect to the '989 Patent may invalidate the '576 Patent as well. Accordingly, all parties—including those identified as Secondary Defendants in our September 25, 2015 Case Management Order (Doc. 125)—**SHALL** file a joint status report within fourteen days hereof, stating their views on whether this order effectively resolves this action as to all parties and whether judgment should be entered accordingly.

**IT IS SO ORDERED.**